# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re Application of HANSAINVEST
Hanseatische Investment-GmbH in respect of
the fund Aramea Rendite Plus; Trinity
Investments Designated Activity Company;
BFAM Asian Opportunities Master GP
Limited as general partner of BFAM Asian
Opportunities Master Fund, L.P.; Caspian
Select Credit Master Fund, Ltd.; Caspian
Solitude Master Fund, L.P.; Caspian HLSC1,
LLC; Caspian SC Holdings, L.P.; Caspian
Focused Opportunities Fund, L.P.; Blackstone
Alternative Investment Funds plc in respect of
its fund Blackstone Diversified Multi Strategy
Fund; Blackstone Alternative Multi Strategy
Sub Fund IV, LLC; Citadel Equity Fund Ltd.;
Citadel Equity (Ireland) Designated Activity
Company; Biwa Fund Ltd.; CQS Dedicated
Multi Strategy Fund Ltd.; CQS Directional
Opportunities Master Fund Ltd.; Gracechurch
Opportunities Fund Limited; CQS Global
Funds ICAV in respect of its sub-fund CQS
ACS Fund; CQS Aiguille du Chardonnet MF
S.C.A. SICAV-SIF; Farmstead Master Fund,
Ltd., OC 530 Offshore Fund, Ltd.; NB 530
Offshore Fund, Ltd.; Greywolf Event Driven
Master Fund; KLS Diversified Master Fund
GP Ltd. as general partner of KLS Diversified
Master Fund, L.P.; Lex Financial Investments
(Luxembourg), S.à r.l.; Marathon Credit
Dislocation Fund, L.P.; Marathon Blue Grass
Credit Fund, L.P.; Marathon Centre Street
Partnership, L.P.; Gold Coast Capital
Subsidiary I Ltd.; TRS Credit Fund, L.P.;
Marathon European Credit Opportunity Master
Fund II, Ltd.; Marathon Special Opportunity
Master Fund, Ltd.; Monarch Master Funding 2
(Luxembourg) S.a.r.l.; SC Lowy Primary
Investments, Ltd.; SPC Lux S.à r.l.; Sound
Point Credit Opportunities GP LLC as general
partner of Sound Point Credit Opportunities
Master Fund, L.P.; Sound Point Montauk GP,
LLC as general partner of Sound Point
Montauk Fund, L.P.; Stonehill Master Fund

Civil Action No.

Ltd.; Stonehill Institutional Partners, L.P.; TT
International Hedge Funds SPC in respect of
the segregated portfolio TT Event Driven Fund
Segregated Portfolio; and TT International
Fund Ltd. for an Order Pursuant to 28 U.S.C. §
1782 Granting Leave to Obtain Discovery for
Use in a Foreign Proceeding

**<u>MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION FOR AN
ORDER PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN
DISCOVERY FOR USE IN A FOREIGN PROCEEDING</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    The Relevant Entities ..................................................................................2

    B.    The T1 Securities ........................................................................................3

    C.    Sale of HSH and a Portfolio of Performing and Non-Performing Loans ...............4

    D.    Excessive Use of the 340g Reserve and Improper T1 Book Value
        Determination ..............................................................................................6

    E.    Losses Carried Forward ...............................................................................7

    F.    The Nature of the Foreign Proceeding ...................................................7

    G.    The Documents Sought ................................................................................7

LEGAL FRAMEWORK .........................................................................................................9

ARGUMENT .......................................................................................................................11

I.    THE APPLICATION SATISFIES THE PREREQUISITES OF 28 U.S.C. § 1782 .........11

    A.    Respondents Are "Found" in This District .................................................11

    B.    The Discovery Sought Is for Use in a Foreign Proceeding ....................11

    C.    Applicants Are "Interested Persons" .....................................................12

II.    THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT THE
      APPLICATION ...............................................................................................12

    A.    Respondents Will Not Be Participants in the German Litigation and the
        Discovery Sought Is Outside the Jurisdictional Reach of German Courts ...........12

    B.    German Courts Are Receptive to Section 1782 Discovery ....................13

    C.    Applicants Are Not Attempting to Circumvent German Proof-Gathering
        Restrictions ................................................................................................14

    D.    The Requested Discovery Would Not Be "Unduly Intrusive or
        Burdensome".............................................................................................16

CONCLUSION....................................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ........................................................................... 9, 10

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015) ............................................................................... 12

*Cryolife, Inc. v. Tenaxis Med., Inc.*,
  2009 WL 88348 (N.D. Cal. Jan. 13, 2009) ....................................................... 14

*Ecuadorian Plaintiffs v. Chevron Corp.*,
  619 F.3d 373 (5th Cir. 2010) ............................................................................. 13

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ......................................................................... 10, 13

*Gushlak v. Gushlak*,
  486 Fed. App'x 215 (2d Cir. 2012) ..................................................................... 2

*Heraeus Kulzer, GmbH v. Biomet, Inc.*,
  633 F.3d 591 (7th Cir. 2011) ................................................................... 13, 14, 15

*In re Application of Cal. State Teachers' Ret. Sys.*,
  2016 WL 7477753 (D.N.J. Dec. 28, 2016) ........................................................ 16

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*,
  2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ............................................... 14, 16

*In re Application of Imanagement Servs. Ltd.*,
  2006 WL 547949 (D.N.J. Mar. 3, 2006) ............................................................. 13

*In re Application of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*,
  2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ..................................................... 13

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002) ............................................................................... 10

*In re Ex Parte Apple Inc.*,
  2012 WL 1570043 (N.D. Cal. May 2, 2012) ................................................. 14, 16

*In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*,
  2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) .................................................. 14, 15

*In re Hornbeam Corp.*,
  2018 WL 416486 (2d Cir. Jan. 16, 2018) ............................................................ 2

*In re Kiobel*,
  2017 WL 354183 (S.D.N.Y. Jan 24, 2017) ......................................................... 11

*In re Mangouras*,
  2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) .......................................................... 11

*In re Mesa Power Grp. LLC*,
  2012 WL 6060941 (D.N.J. Nov. 20, 2012) .......................................................... 2, 15

*In re: Ex Parte Application Varian Med. Sys. Int'l AG*,
  2016 WL 1161568 (N.D. Cal. Mar. 24, 2016) .......................................................... 14

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ............................................................................................ passim

*Kulzer v. Esschem, Inc.*,
  390 Fed. App'x 88 (3d Cir 2010) .......................................................................... 15

*LEG Q LLC v. RSR Corp.*,
  2017 WL 3780213 (N.D. Tex. Aug. 31, 2017) ...................................................... 12

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015) .................................................................................. 16

*Minatec Finance S.A.R.L. v. SI Group Inc.*,
  2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ...................................................... 14

## Statutes

28 U.S.C. § 1782 ..................................................................................................... 1, 2, 9

28 U.S.C. § 1782(a) ...................................................................................................... 1

Applicants[1] respectfully submit this memorandum of law in support of their *ex parte* application for an order pursuant to 28 U.S.C. § 1782 granting leave to obtain targeted discovery from Cerberus Capital Management, L.P. ("Cerberus"), J.C. Flowers & Co. LLC ("J.C. Flowers"), and GoldenTree Asset Management L.P. ("GoldenTree"), (together, "Respondents") for use in a foreign proceeding.

## PRELIMINARY STATEMENT

This is a straightforward Section 1782 application.  A consortium of private investors have agreed to acquire the German bank HSH Nordbank AG ("HSH" or the "Bank"). Applicants believe that the acquisition has been intentionally structured to harm holders of certain types of capital instruments indirectly issued by HSH.  As holders of such instruments, Applicants anticipate filing a lawsuit against HSH in Germany (the "German Litigation") related to the acquisition, as well as to other accounting abuses described below.  Indeed, a demand letter has already been sent, and a response already received, setting up the German Litigation. Because Respondents are direct or indirect parties to the relevant transactions, they are likely to have in their custody and control relevant information and documents.[2]

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to . . . produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person."  28 U.S.C. § 1782(a).  These statutory requirements are satisfied here.  Respondents may each be found in this district, the discovery sought is for use in the German Litigation, and Applicants will be the plaintiffs in the German Litigation.

---

[1]  "Applicants" are those parties appearing in the caption to this filing.
[2]  Applicants may eventually find a need for testimony as well, but are not seeking such relief at this time.  The Proposed Subpoenas only ask for the production of documents.

The application also satisfies the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 244-45 (2004):  (1) Respondents will be non-participants in the German Litigation and may not be compelled to produce any related documents or other information in Germany; (2) the discovery Applicants seek is highly relevant to the German Litigation; (3) the application is not an attempt to circumvent German proof-gathering restrictions; and (4) producing the documents will present minimal burden to Respondents.

Courts within this Circuit have authorized the *ex parte* filing of applications for discovery under 28 U.S.C. § 1782.[3]  This *ex parte* application does not prejudice Respondents' rights to move to quash any subpoena that the Court may allow to issue.  Applicants thus respectfully request that the Court grant the application and allow the issuance of subpoenas substantially in the form of those contained in Exhibits A, B, and C to the concurrently filed application (together, the "Proposed Subpoenas").

## BACKGROUND

### A.   The Relevant Entities

*Applicants* hold hybrid capital instruments ("T1s")[4] indirectly issued by HSH.

*HSH* is a German bank that was once one of the world's largest shipping financiers.

---

[3]  *See, e.g.*, *In re Hornbeam Corp.*, 2018 WL 416486, at *2 (2d Cir. Jan. 16, 2018) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *Gushlak v. Gushlak*, 486 Fed. App'x 215, 217 (2d Cir. 2012) (same); *In re Mesa Power Grp. LLC*, 2012 WL 6060941, at *4 (D.N.J. Nov. 20, 2012) ("[I]t is 'appropriate for this Court to issue the order on an *ex parte* basis, without prejudice to the rights of the subpoenaed parties to file a motion to vacate or quash' within thirty days of the issuance of this order.").

[4]  References to the T1s include, where applicable, the various contracts and rights that are associated with the listed securities, including but not limited to the terms and rights under the related silent participations, Class A and Class B Securities, the Loan Agreements, the Support Undertakings, and the Terms and Conditions of the bonds as such terms are defined in the relevant T1 documents.

*Cerberus Capital Management, L.P.* is a Delaware limited partnership with its principal place of business in New York, New York.  Cerberus is a private investor specializing in investments in distressed securities and assets.  Cerberus has a network of subsidiaries, affiliate offices, and portfolio companies throughout the U.S., Europe, and Asia.  Its global investment strategies are directed from Cerberus Capital Management, L.P.'s headquarters in New York City and all global business is subject to oversight from Cerberus Capital Management, L.P. After the Bank Sale closes, Cerberus will hold—through three associated funds—40.3% of HSH's share capital and an interest in the NPL Portfolio.

*J.C. Flowers* is a Delaware limited liability company with its principal place of business located in New York, New York.  J.C. Flowers specializes in worldwide investments in the financial services sector, overseeing its operations from its headquarters here.  J.C. Flowers (through nine different trusts) has been a shareholder in HSH since 2006 and its senior executives have been members of HSH's supervisory board since 2009.  After the Bank Sale closes, J.C. Flowers will hold—through one of its European funds (J.C. Flowers IV Neptun Holdings S.à r.l.)—33.2% of HSH's share capital and an interest in the NPL Portfolio.

*GoldenTree* is a Delaware limited partnership with its principal place of business located in New York, New York.  It is a large, independent asset manager with an investment focus on credit opportunities globally.  While it has affiliate offices in Europe, Asia, and Australia, all business is monitored or directed by the New York office.  After the Bank Sale closes, GoldenTree will hold—through one of its European funds (GoldenTree Asset Management Lux S.à r.l.)—11.9% of HSH's share capital and an interest in the NPL Portfolio.

### B.    The T1 Securities

The T1s were originally issued at par, reflected at par on the Bank's books, and entitled to coupon payments.  If HSH incurs a particular type loss under German GAAP, the book value

of the T1s may be written down to reflect such loss, and HSH is not obliged to make coupon payments for a period in which the book value of the T1s is less than par.  If HSH incurs a profit, the book value of the T1s must be written up; and once written-up to par, coupon payments are resumed.  The book value of the T1s has been below par for a number of years and was written down further in 2017.

C.     **Sale of HSH and a Portfolio of Performing and Non-Performing Loans**

As a condition to a bailout by two German states during the financial crisis, the European Commission ("EC") ordered HSH to be privatized by the end of February 2018.  On February 28, 2018, the then-majority shareholders agreed to sell their stake in HSH to a consortium of private investors for approximately €1 billion (the "Bank Sale").  Under the Bank Sale terms, HSH will be (indirectly) acquired by a consortium of private investors including Cerberus, J.C. Flowers, GoldenTree, Centaurus Capital L.P. ("Centaurus"), and BAWAG P.S.K. AG (together, the "Buyers").

In connection with the Bank Sale, HSH agreed to sell a portfolio of performing and non-performing loans with a then net book value of €3.53 billion (the "NPL Portfolio") for only €2.45 billion (the "NPL Portfolio Sale").  The NPL Portfolio Sale involves special purpose vehicles owned by Cerberus, J.C. Flowers, GoldenTree, and Centaurus (together, the "NPL Buyers").  HSH has admitted that the NPL Portfolio Sale was a "major part" of the Bank Sale, and that the terms and timeline were therefore "closely linked."[5]

Because the consideration paid for the NPL Portfolio was far below the (already previously reduced) book value of the NPL Portfolio,[6] HSH recognized a €1.08 billion loss on

---

[5]   *See* Declaration of Nadine E. Herrmann in Support of *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in a Foreign Proceeding, dated July 2, 2018 ("Herrmann Decl."), ¶ 5.

[6]   The NPL Portfolio actually had an "exposure at default" value of over €6 billion.

the NPL Portfolio Sale in its 2017 accounts (which may contain further irregularities). This loss purportedly allowed the Bank to further write down the book value of the T1s for 2017.

Applicants reasonably anticipate litigation against HSH in part because they believe the NPL Portfolio Sale was improper. The Buyers received an extreme bargain on the NPL Portfolio itself, *and* the accounting losses created by the NPL Portfolio Sale led to a further write-down of the T1s. As HSH is only obligated to make coupon payments when the T1s are booked at par value, putting them deep in the hole will lower HSH's future financing costs. This all, in turn, made HSH more attractive to the Buyers. This win-win for the sellers, the Buyers, and the NPL Buyers came at the expense of T1 holders like Applicants.

The underlying merits of Applicants' claims regarding the fairness, propriety and intent of the Bank Sale and the NPL Portfolio Sale are, of course, for the German courts to decide; but Applicants have a solid basis for litigation. The inside nature of the NPL Portfolio Sale, and the decision to sell HSH and the NPL Portfolio (at a deep discount to book value) to virtually the same investor consortium, strongly suggest severe irregularities in both the Bank Sale and the NPL Portfolio Sale transactions.

As an example of another red flag, just a few months before the Bank Sale, HSH boasted that, due to improving conditions in the shipping market, it could accelerate the wind-down of its legacy non-performing shipping loans "without putting any additional pressure on earnings."[7] Yet another red flag is that, right after selling a massive portfolio of *shipping loans* that were part of the NPL Portfolio for a huge loss, HSH announced it would be looking to *re-invest in the*

---

[7]   HSH Nordbank AG, *Financial Information as at 30 September 2017* at 4 (Nov. 29, 2017), https://www.hsh-nordbank.de/media/pdf_3/investorrelations/geschaeftsber/2017_3/ finanzinformationen_3/q3_2017_financial_information.pdf.

*shipping industry*.[8]  And another is that, prior to the Bank Sale and the NPL Portfolio Sale, HSH confidently predicted that it would be making coupon payments on the T1s in 2020 for the 2019 financial year.[9]  For this prediction to be reasonable, HSH would have had to believe that the T1s would have been written-up to par by then.  This is incompatible with HSH's supposed need to take a massive write-down on the NPL Portfolio in its 2017 accounts.

Also suspect is the timing of HSH's recognition of the loss that arose due to the NPL Portfolio Sale.  Even though (a) HSH has publicly stated it did not learn of the NPL Portfolio Sale until early 2018, (b) the deal documents were not signed until February 2018, and (c) the transaction will not close until the fall of 2018, HSH nonetheless recognized the loss on its fiscal year 2017 books, including those under German GAAP.  This retroactive application of the book loss from the NPL Portfolio Sale under German GAAP not only is another sign as to the transaction's true motivations, but may also give rise to yet additional legal claims against HSH.

**D.**    **Excessive Use of the 340g Reserve and Improper T1 Book Value Determination**

From 2012 to 2016, HSH allocated over a billion euros to a so-called fund for general banking risks under its German GAAP accounts.  Under Section 340g of the German Commercial Code, such funds may only be used by a bank as a protection against general banking risks (the "340g Reserve").  The German Litigation will involve allegations that HSH created 340g Reserves in contravention of the relevant statute and did so excessively, generating artificial losses—which it improperly used to write-down the book value of the T1s.  The

---

[8]  Jonathan Saul, *Exclusive – Germany's HSH Nordbank says aims to buy shipping loans from other banks*, REUTERS (Jun. 14, 2018), https://uk.reuters.com/article/uk-hshnordbank-shipping-exclusive/exclusive-germanys-hsh-nordbank-says-aims-to-buy-shipping-loans-from-other-banks-idUKKBN1JA1FA.

[9]  HSH Nordbank AG, Financial Information as at 30 September 2017 at 20 (Nov. 29, 2017), https://www.hsh-nordbank.de/media/pdf_3/investorrelations/geschaeftsber/2017_3/finanzinformationen_3/q3_2017_financial_information.pdf.

German Litigation will also allege that HSH violated the terms of the T1s by mistreating the 340g Reserve when calculating the book value of the T1s.

### E.  **Losses Carried Forward**

Further to the losses already absorbed by the T1s in 2017, HSH may impermissibly seek to carry forward the 2017 German GAAP annual balance sheet loss into subsequent years.  This (in what amounts to a gimmick) can lead to additional balance sheet losses in the future.  This would constitute a so-called "double burden," as it would allow HSH to write down the value of the T1s on a recurring basis for losses only suffered once.  HSH has consistently refused to declare that it will not subject T1 holders to such a practice, even though doing so would violate the terms of the T1s as well as German law.

### F.  **The Nature of the Foreign Proceeding**

In the German Litigation, Applicants will allege, without limitation, that HSH (i) breached its duties to investors under Section 280 of the German Civil Code by intentionally structuring and pricing the Bank Sale and the NPL Portfolio Sale to the detriment of T1 holders; (ii) willfully caused damages to Applicants through conduct contrary to public policy, in violation of Section 826 of the German Civil Code; (iii) abused the use of, and unlawfully made allocations to, the 340g Reserve, violating the German Commercial Code and the terms of the T1s (iv) violated the terms of the T1s by improperly calculating their book value; (v) would be in violation of the terms of the T1s should it carry forward losses in a manner that causes a "double burden" for the T1s.

### G.  **The Documents Sought**

In the Proposed Subpoenas, Applicants seek the Bank Sale and NPL Portfolio Sale transactional documents themselves, as well as documents relating to the valuation of the NPL Portfolio.  In addition, the Proposed Subpoenas seek documents related to HSH's use of the 340g

Reserve, the calculation of the book value of the T1s, HSH's decision to book the losses incurred by the NPL Portfolio Sale in its 2017 German GAAP accounts, the potential for placing a "double burden" on T1 holders by carrying forward losses, and all other documents related to the actual and potential write-down/up of the T1s.  Such documents will plainly help answer the central questions that will be raised in the German Litigation, *e.g.*, whether HSH willfully damaged T1 holders through its transactional and accounting shenanigans.

There is strong reason to believe that Respondents have relevant documents in their custody and control.  Respondents are the main actors in the investor consortium purchasing both the majority of shares in HSH and the NPL Portfolio.  All Respondents are headquartered in New York, New York, and, according to their own statements, are developing and monitoring their global investment strategies out of their respective New York headquarters.[10]  During the negotiation of the Bank Sale and the NPL Portfolio Sale, they were in close contact with HSH and the sellers, negotiating the structure of the deal and the consideration for both the shares in HSH and the NPL Portfolio.  Also, as part of the due diligence process, Respondents obtained significant insights into the accounting practices of HSH, including their valuation of the Bank and the NPL Portfolio.

---

[10]   *See Who We Are–Cerberus Capital Management*, http://www.cerberuscapital.com/the-firm (last visited Jun. 26, 2018) ("Cerberus directs its global investment strategies from its headquarters in New York City"); Herrmann Decl. ¶ 7, Ex. 2 at 12 of PDF ("The Dutch offices [have employees] who make investment and disposition decisions in conjunction with the Adviser's [Cerberus] New York office with respect to a significant portion of the Clients' non-U.S. investments."); *id.* ¶ 8, Ex. 3 at 13 of PDF ("J.C. Flowers & Co. UK LLP is a subsidiary of the Adviser [J.C. Flowers] that renders investment sub-advisory services to the Adviser regarding investment opportunities, primarily in Europe and Asia"); *GoldenTree*, https://www.goldentree.com (last visited Jun. 26, 2018) ("The approach of the Firm [GoldenTree's UK subsidiary] in relation to engagement with issuers and their management are determined globally, on a group wide basis" (follow link at "Legal Disclosures/Terms of Use," at bottom of home page)).

There is also no question that Respondents would have taken into account the historical and present book value of the T1s, as well as all issues relating thereto, in assessing the value of their investment in HSH.  As such, Applicants believe Respondents are also likely to have documents relevant to HSH's abuses of the 340g Reserve, even if the Respondents did not have a direct role in such abuses.

In addition to its role as a Buyer, J.C. Flowers has been a shareholder of HSH since 2006 and its senior executives have been members of HSH's supervisory board throughout that time. J.C. Flowers has extensive knowledge of HSH's past accounting decisions as the supervisory board is responsible for approving each of HSH's German GAAP accounts, and is likely to have been involved in HSH's internal discussions of the Bank Sale and the NPL Portfolio Sale.

## LEGAL FRAMEWORK

Section 1782 permits United States District Courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding.  *Intel*, 542 U.S. at 259.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . .  The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.  An application made pursuant to Section 1782 thus must satisfy three statutory requirements:  "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

After determining that the three statutory requirements are satisfied, courts then consider four discretionary factors in deciding whether to grant a Section 1782 application:  (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests.  *See Intel*, 542 U.S. at 264-65.

Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See*, *e.g.*, *id.* at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("Congress has expressed as its aim that the statute be interpreted broadly . . . .").  Accordingly, courts "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995) (also noting that grant of discretion is invitation to fashion "creative means" of serving those goals).

## ARGUMENT

### I.     THE APPLICATION SATISFIES THE PREREQUISITES OF 28 U.S.C. § 1782

#### A.     Respondents Are "Found" in This District

All Respondents maintain their principal places of business in New York, New York.
*See* Herrmann Decl. ¶ 7, Ex. 2 at 2 of PDF; *id.* ¶ 8, Ex. 3 at 2 of PDF; *id.* ¶ 9, Ex. 4 at 2 of PDF.
Thus, Respondents may be "found" in this District for purposes of Section 1782.

#### B.     The Discovery Sought Is for Use in a Foreign Proceeding

As discussed above, the Proposed Subpoenas seek documents relevant to the German
Litigation.  It is undisputable that the German courts are "foreign tribunals," that the
contemplated action would be a "foreign proceeding," and that the documents are being sought
only "for use" therein.  This statutory requirement is thus also easily met.

This is true even though Applicants have not yet initiated a full and formal case in
Germany.  "Where an applicant has not yet initiated a foreign proceeding, discovery is available
when the materials may help the applicant either to plead or to prove the anticipated claims.
Indeed, 'the foreign proceeding need not be pending, so long as it is 'within reasonable
contemplation.'"  *In re Mangouras*, 2017 WL 4990655, at *5 (S.D.N.Y. Oct. 30, 2017); *see also
Intel*, 542 U.S. at 259.  A foreign proceeding is within "reasonable contemplation" when an
applicant "provide[s] some objective indicium that the action is being contemplated."  *In re
Kiobel*, 2017 WL 354183, *3 (S.D.N.Y. Jan 24, 2017).

Applicants have taken numerous steps that constitute objective evidence that the German
Litigation is "within reasonable contemplation."[11]  As discussed above, for instance, Applicants
have already sent demand letters to HSH.  *See id.* (finding foreign proceeding was in reasonable

---

[11]     *See* Herrmann Decl. ¶ 3.

contemplation where counsel had drafted a writ of summons and engaged in pre-litigation

correspondence with the target of the foreign litigation); *LEG Q LLC v. RSR Corp.*, 2017 WL

3780213, at *6 (N.D. Tex. Aug. 31, 2017) (finding requirement satisfied where applicant had

engaged in pre-action correspondence with intended defendants).  HSH, acting by its German

counsel, has recently responded by denying all the allegations and any liability, setting up the

German Litigation.

        C.      **Applicants Are "Interested Persons"**

While Section 1782 broadly covers those with the right to participate and submit

evidence in foreign proceedings, *see Certain Funds*, *Accounts &/or Inv. Vehicles v. KPMG*,

*L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and

may be the most common example of, the 'interested person[s] who may invoke § 1782," *Intel*,

542 U.S. at 256.  Applicants will be the plaintiffs in the German Litigation, and therefore they

are "interested persons" under Section 1782.

**II.**     **THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT THE
APPLICATION**

        A.      **Respondents Will Not Be Participants in the German Litigation and the
Discovery Sought Is Outside the Jurisdictional Reach of German Courts**

The Supreme Court has recognized that the need for U.S. court assistance is most

apparent where the Section 1782 respondent is not a party to the foreign action and not otherwise

within the jurisdiction of the foreign court.  *See Intel*, 542 U.S. at 264 ("[N]onparticipants in the

foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their

evidence, available in the United States, may be unobtainable absent § 1782(a) aid.").  Here,

Respondents will not be parties to the German Litigation.  Nor will the German tribunals

otherwise have the power to compel discovery by them.[12]  Thus, this first *Intel* factor weighs in favor of granting the application.

### B.   German Courts Are Receptive to Section 1782 Discovery

For purposes of Section 1782, a foreign tribunal's "receptivity" involves not whether a particular tribunal would permit discovery in a given proceeding, but how a "foreign legal system . . . might respond to § 1782 assistance from a United States court."  *In re Application of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009).  The party opposing Section 1782 discovery bears the burden of establishing a lack of receptivity, *see Euromepa*, 51 F.3d at 1100, and must affirmatively demonstrate that the foreign tribunal would be unreceptive, *see Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 597 (7th Cir. 2011) ("Once a section 1782 applicant demonstrates a need for extensive discovery for aid in a foreign lawsuit, the burden shifts to the opposing litigant to demonstrate, by more than angry rhetoric, that allowing the discovery sought . . . would disserve the statutory objectives.").  Only a "clear directive" from the foreign legal system that it "would reject evidence" produced in the United States can demonstrate that the foreign tribunal lacks receptivity.  *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 377 (5th Cir. 2010).[13]

---

[12]   Though it should be irrelevant to the current application, Applicants note that the European affiliates of Respondents that were also involved in the Bank Sale and the NPL Portfolio Sale will not be parties to the German Litigation and the German tribunals will not otherwise have the power to compel discovery from them, either.  Of course, should the investigation uncover a basis to make anybody an additional party to the German Litigation, Applicants reserve all rights to do so.  But Applicants note here that even if additional parties were named in the German Litigation, that would not alter the *Intel* analysis.  As discussed below, the German system does not allow for the type of discovery sought here, even as against defendants.

[13]   *See also In re Application of Imanagement Servs. Ltd.*, 2006 WL 547949, at *4 (D.N.J. Mar. 3, 2006) ("When analyzing this consideration, courts have determined that there

There is no indication here, much less any "clear directive," that the German court would reject the introduction of the discovery that Applicants seek.  To the contrary, U.S. courts have repeatedly granted 1782 applications to obtain discovery for use in the German system, because of the noted *lack* of any evidence of such hostility.  *See*, *e.g.*, *In re: Ex Parte Application Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *4 (N.D. Cal. Mar. 24, 2016) ("There is no evidence or case law suggesting that the Mannheim District Court would be unreceptive to the discovery Varian seeks."); *In re Ex Parte Apple Inc.*, 2012 WL 1570043, at *2 (N.D. Cal. May 2, 2012) (Section 1782 respondent could provide no affirmative evidence that German courts would be unreceptive to the discovery); *Heraeus Kulzer*, 633 F.3d at 596 ("[T]here is no indication that the German court in which Heraeus's suit against Biomet is pending would refuse to admit evidence that Heraeus obtained through U.S. discovery and could not have obtained by utilizing the procedures of German law for evidence gathering.").[14]

## C.    Applicants Are Not Attempting to Circumvent German Proof-Gathering Restrictions

The third *Intel* factor requires courts to consider whether the applicant is attempting to circumvent foreign discovery limits.  This factor is designed to weed out bad-faith abuse of the Section 1782 process.  *See Minatec Finance S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *8

---

was a lack of receptivity only by affirmative evidence, such as evidence showing that the foreign jurisdiction rejected outright federal judicial assistance from the United States.").

[14]   *See also In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) (on motion to quash, receptivity factor weighed in favor of granting application where there was no evidence that a German court would object to evidence obtained through Section 1782); *Cryolife, Inc. v. Tenaxis Med., Inc.*, 2009 WL 88348, at *3 (N.D. Cal. Jan. 13, 2009) (finding "no basis to conclude that the German court would be unreceptive to the information requested"); *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006) (receptivity factor weighed in applicant's favor even though German courts had declined to compel production of the requested discovery).

(N.D.N.Y. Aug. 18, 2008) (finding third *Intel* factor weighed in favor of granting application because "we find nothing within this record to support that Minatec is seeking this information with less than a good faith belief that § 1782 discovery would be helpful to the foreign tribunals and itself").

Because Respondents—Delaware entities each with their principal places of business in New York—are not German entities and will not be parties to the German Litigation, the only way that Applicants may obtain the requested discovery is through Section 1782.  It is only in good faith that Applicants seek U.S. assistance in obtaining documents from entities that are outside the jurisdictional reach of the tribunals that will be handling the German Litigation.  Thus, this third *Intel* factor weighs in favor of granting Applicant's application.  *See*, *e.g.*, *Heraeus Kulzer*, 633 F.3d at 596 ("The importance of American-style discovery to Heraeus's ability to prove misappropriation of its trade secrets by Biomet is undeniable.  But potential for abuse?  We don't see it."); *In re Mesa Power Grp.*, *LLC*, 2013 WL 1890222, at *7 (D.N.J. Apr. 19, 2013) (finding no circumvention because there was no evidence that the application was "an attempt to side-step proof-gathering or other restrictions" and the respondent "may be outside the jurisdictional reach of the tribunal").

Even in the unlikely event it were somehow shown that the Respondents were subject to the reach of the German tribunals, this factor would *still* weigh in favor of granting the application.  This is because the German system does not allow for the same type of document requests as is typical here,[15] and thus the request for U.S. assistance would still be one being

---

[15]   *See*, *e.g.*, *Heraeus Kulzer*, 633 F3d at 596 ("A party to a German lawsuit cannot demand categories of documents from his opponent.  All he can demand are documents that he is able to identify specifically—individually, not by category."); *Kulzer v. Esschem, Inc.*, 390 Fed. App'x 88, 92 (3d Cir 2010) ("German civil procedure does not offer a mechanism for general

made in good faith.  *See Mees v. Buiter*, 793 F.3d 291, 304 n.20 (2d Cir. 2015) ("That a country

does not enable broad discovery within a litigation does not mean that it has a policy that

restricts parties from obtaining evidence through other lawful means."); *Apple Inc.*, 2012 WL

1570043, at *2 (rejecting the argument that the applicant was attempting to circumvent German

proof-gathering restrictions by seeking discovery not available under German procedural rules);

*In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *7

(S.D.N.Y. Dec. 29, 2006) (rejecting circumvention argument and finding that permitting

applicant to obtain discovery unavailable in Germany "in some respects . . . is precisely the type

of assistance the statute was designed to afford"); *see also generally In re Application of Cal.

State Teachers' Ret. Sys.*, 2016 WL 7477753, at *3 (D.N.J. Dec. 28, 2016) (rejecting argument

that German courts would not be receptive to Section 1782 evidence despite refusals by German

authorities to themselves turn over documents similar to those being sought by the way of the

1782 application).

### D.     The Requested Discovery Would Not Be "Unduly Intrusive or Burdensome"

Finally, the fourth *Intel* factor instructs the courts to consider whether the request is

"unduly intrusive or burdensome."  *Intel*, 542 U.S. at 265.  In considering this factor, a court

must determine whether the discovery requests encompassed in the application are "sufficiently

tailored to the litigation issues for which production is sought."  *Gemeinschaftspraxis*, 2006 WL

3844464, at *8.

---

pretrial discovery comparable to that obtainable in the United States; any request to the German
court must be for specific documents."); *Porsche*, 2016 WL 702327, at *2 ("Here, although there
is some quibbling among the experts about the availability in the German court of the documents
and testimony sought here, there is little question that it cannot and, in any case, would not order
the type (and scope) of evidentiary production sought by Porsche in this Court.").

In the German Litigation, Applicants will need to establish that, among other facts, HSH sold the NPL Portfolio below market value, used the 340g Reserve contrary to its legal purpose, and inflated the loss participation of the T1s by refusing to consider the 340g Reserve as part of its liable capital and as a reserve under the terms of the T1s.  Thus, the key issues in the German Litigation will include the structure of the Bank Sale, the valuation of the NPL Portfolio, the accounting consequences and timing of the foregoing, and HSH's reasons for allocations to the 340g Reserve, and HSH's improper calculations of the loss participations of the T1s.

The Proposed Subpoenas go right to such issues, by seeking documents concerning:

- the terms and structure of the Bank Sale, including HSH's decision to sell the NPL Portfolio in a separate transaction (Request Nos. 1-2, 8).

- HSH's valuation of the NPL Portfolio and HSH's shares in connection with the NPL Portfolio Sale and the Bank Sale, respectively (Request Nos. 3-4, 7);

- HSH's consideration of the impact that the Bank Sale and the sale of the NPL Portfolio would have on T1s (Request Nos. 5-6);

- the participation of hybrid capital instruments such as T1s in losses incurred by HSH (Request No. 9, 11-12; 15);

- HSH's use of its 340g Reserve in the years leading up to the Bank Sale including HSH's assessment as to whether the 340g Reserve is part of its liable capital and constitutes a reserve (Request Nos. 10-12; 16);

- HSH's plans to carry losses forward from previous years (Request No. 13), and

- HSH's considerations to terminate or call the T1s (Request No. 14).

In light of their relevance to the claims in the German Litigation, the discovery requests are not unduly burdensome.  The German Litigation involves transactions occurring at a specific time among a specific group of players and a very narrow (but important) accounting practice. The efforts to gather materials regarding such a discrete set of events pale in comparison to their importance to the German Litigation.

17

However, it is worth again noting that this application is merely for the issuance of the Proposed Subpoenas. Such issuance would be understood by Applicants to be without prejudice to the rights of Respondents to object to the requests. Any dispute about the specific terms, or the scope of the gathering efforts required, can first be dealt with by the parties directly through good-faith negotiations. Thus, even if there are concerns about any of the requests (which there should not be), respectfully, Applicants submit those concerns need not be resolved by the Court at this stage and should not be grounds for denial of the application.

## **CONCLUSION**

For the reasons set forth above, Applicants respectfully request that the Court grant its *ex parte* application for leave to serve the Proposed Subpoenas.

DATED:   New York, New York
             July 2, 2018

                                    QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                    By:/s/ Daniel L. Brockett
                                    _____
                                        Daniel L. Brockett
                                        Jeremy Andersen (*pro hac vice* application
                                            forthcoming)
                                        Thomas J. Lepri

                                    51 Madison Avenue, 22nd Floor
                                    New York, New York 10010-1601
                                    (212) 849-7000

                                    *Attorneys for Applicants*